**Percy Ewell WAINWRIGHT, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Oct. 29, 1985.

Decided: Feb. 21, 1986.

⋅ Nancy Jane Mullen, Asst. Public Defender, Wilmington, for defendant below, appellant.

Gary A. Myers, Deputy Atty. Gen., Dept. of Justice, Georgetown, for plaintiff below, appellee.

Before CHRISTIE, C.J., McNEILLY, HORSEY, MOORE and WALSH, JJ., constituting the Court en banc.

WALSH, Justice:

The defendant, Percy Ewell Wainwright, was convicted following a jury trial in Sussex County of first degree felony murder, 11 *Del.C.* § 636(a)(6), and possession of a deadly weapon during the commission of a felony. The State declined, during trial, to seek the death penalty, and the defendant was sentenced to life imprisonment without probation or parole on the murder charge with a consecutive fifteen year sentence on the weapons charge. The charges stemmed from his participation in the November 3, 1980, attempted robbery of a Bridgeville liquor store and the killing of a store clerk. A codefendant, David Wayne Dodson, was convicted of the same offenses in a separate trial and sentenced to life imprisonment after a jury declined to impose the death penalty.

Although the defendant assigns a number of errors alleged to have occurred at the trial level, we focus on but one. He argues that certain oral statements were obtained by the police in violation of his Fifth Amendment right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1955). Since we conclude that it was plain error to deny suppression of such statements we must reverse and remand for a new trial.

## I

The factual record underlying the admissibility of the disputed statements is drawn from the suppression hearing at which the only witness was Detective Griffith of the Delaware State Police. The defendant did not testify at the suppression hearing.

There were no eyewitnesses to the shooting of the liquor store clerk, and no identifiable fingerprints were recovered from the scene of the crime. However, police investigation led to the arrest of David Dodson on November 11, 1982, for the murder. Dodson told the police that he and the defendant were present at the time the clerk was shot, but that the defendant went into the liquor store to rob it and shot the clerk while Dodson remained outside. Based on Dodson's statement, a fugitive warrant was issued and the defendant was arrested at his residence in Maryland on the same day. Detective Griffith accompanied a Maryland State Police detective when the warrant was executed. The Maryland officer read the defendant his *Miranda* rights and advised Wainwright about the warrant on file in Delaware for first degree murder but the defendant declined to give a statement to Griffith.

The defendant waived extradition and was brought back to Delaware on November 16, 1982. On the morning of November 16, when Detectives Griffith and Lee of the Delaware State Police went to Anne Arundel County Prison to pick up the defendant and transport him to Delaware, the Delaware detectives did not read the *Miranda* rights to the defendant. The detectives simply transported the defendant in silence to the Delaware State Police Barracks in Georgetown.

Upon arrival at the Barracks in Georgetown, the defendant was first taken to the Troop Commander's Office where he was advised "why he was brought back to Delaware and what he was being charged with." Detective Griffith read the *Miranda* rights to the defendant from a card issued to the state police. In response, the defendant stated that he would like to have

an attorney present. At that point, Detective Griffith stopped questioning the defendant and took him to the processing room. Detective Griffith testified that before the defendant was taken to the processing room, however, he advised the defendant that he was being charged with "murder one of Mr. William Hastings at Bridgeville, Delaware," and that the reason he was being charged was that codefendant David Wayne Dodson had given a complete statement describing how he and Wainwright had gone to Lord's Package Store where Wainwright shot Hastings. Detective Griffith described the exchange as follows:

Q. And you told him the substance of what David Dodson had said?

A. Yes, sir.

Q. What was that?

A. That Mr. Dodson had admitted going to the package store with Mr. Wainwright, but in his statement he had stated that he had been going to stay outside the package store while Mr. Wainwright had gone in, and Mr. Wainwright had been the one that went inside the package store and committed the murder.

Q. So within five or ten minutes after this man said he wanted an attorney, you were telling him what David Dodson had said?

A. I was advising him why he was brought back to Delaware and what he was being charged with.

Q. And you were telling him the substance of the statement that the police got from Dodson?

A. Yes, sir.

Q. What was his response to this?

A. There was no response.

After fingerprinting, the defendant was given lunch and placed in a cell. No conversation took place during lunch. At about 1:00 p.m., Detective Griffith took the defendant to the Magistrate Court, located approximately three hundred yards from the police station. Detective Griffith testified that as he pulled up to the Magistrate

Court the defendant turned to him and said: "I didn't kill that man, he stabbed me twice." At that point, Griffith advised the defendant that since he had elected to have counsel, the detective could not talk to him about the case. The defendant then asked Griffith if he could retract his request for counsel, and Griffith told the defendant that he would call the "District Attorney" and have a defense attorney present, and then the defendant could tell his story. Griffith next told the defendant that if he had not pulled the trigger and killed the man, he might be held as a material witness.

Detective Griffith unsuccessfully attempted to reach a deputy attorney general but did not attempt to reach a defense attorney. Immediately after talking with the deputy attorney general's secretary, Detective Griffith asked the defendant whether he wanted to make a statement or tell the detective what happened. The defendant then made a statement in which he confessed to driving his pickup truck through Bridgeville on the night of the murder, but maintained that Dodson stabbed him after he refused to stop the truck. The defendant finally stopped the truck, and Dodson got out of the truck with a twelve-gauge shotgun. Wainwright waited and a short time later Dodson returned and told the defendant to "get out of here."

At the suppression hearing, defense counsel did not contest the admissibility of the first statement made by the defendant. Defense counsel conceded that "[c]ertainly the officer cannot be expected to control spontaneous statements." Instead, defense counsel challenged the admissibility of the defendant's second statement as a violation of the defendant's right to counsel under *Miranda*.

At the suppression hearing the prosecutor, citing *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) argued that the defendant's statement as he arrived at the Magistrate Court was, itself, initiation of further communication with the police, and the defendant's subsequent statement that "I don't want an attorney now" was a valid waiver of his right to counsel under *Miranda*, after which he willingly gave a statement. Defense counsel did not effectively rebut this argument, and the trial judge, after a recitation of the facts as he understood them, concluded that:

> The only thing that the State has to show is that the defendant was warned of his constitutional rights, that he understood them, and that he waived them. It is clear that he understood them from the fact that he exercised them the first time, and it is further clear that he wanted to waive them by the fact that he asked to waive them.

> \*   \*   \*   \*   \*   \*

> In this particular case, it is clear that he understood them and that he exercised them, and according to the testimony of Officer Griffith, he wanted to initiate a further conversation and withdraw the exercise of that right and wanted to make a statement.... I cannot say that giving him lunch, informing him of the evidence, and bringing him to the Justice of the Peace Court was such overbearing tactics by the police that he was not exercising in (sic) free will....

Because defendant's trial counsel conceded that the defendant's first statement was spontaneous, the trial judge focused only on the waiver aspect of the question of admissibility and ruled, in effect, that defendant's desire to waive his previously invoked right to counsel was established by his own words.

## II

As a threshold consideration we must confront the question of whether the scope of our review may extend to claimed error which was not raised at the trial level. Indeed, the State contends that the concession of partial admissibility by defense counsel not only misled the trial court but now requires this Court to rule upon a

question not fairly raised on the trial record.

This Court, in the ·exercise of its appellate authority, will generally decline to review contentions not raised below and not fairly presented to the trial court for decision. Supreme Court Rule 8; *Jenkins v. State*, Del.Supr., 305 A.2d 610 (1973). On evidentiary issues, the general rule is that evidentiary questions may not be raised for the first time on appeal. *Stevenson v. Henning*, Del.Supr., 268 A.2d 872 (1970). Thus, failure to object to the admissibility of evidence in the trial court may preclude a party from raising the objection for the first time on appeal. *See Young v. State*, Del.Supr., 431 A.2d 1252 (1980); *Rochester v. Katalan*, Del.Supr., 320 A.2d 704 (1974); Del.R.Evid. 103.

To expedite finality and promote economy in litigation, Rule 103 of the Delaware Rules of Evidence requires the parties to raise timely objections to evidence in the trial court or risk losing the right to raise evidentiary issues on appeal. Failure to make an objection at trial constitutes a waiver of the defendant's right to raise that issue on appeal, unless the error is plain. *Goddard v. State*, Del.Supr., 382 A.2d 238 (1977). Rule 103 allows the appellate court to take notice of "plain errors affecting substantial rights" of the parties on appeal, even though the error was not brought to the attention of the trial court. *See* Del.R.Evid. 103(d).

Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. *Dutton v. State*, Del.Supr., 452 A.2d 127, 146 (1982). Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice. *Bromwell v. State*, Del.Supr., 427 A.2d 884, 893 n. 12 (1981). Recently, claims of error implicating basic constitu-

tional rights of a defendant have been accorded review by this Court notwithstanding their nonassertion at trial. *Deputy v. State*, Del.Supr., 500 A.2d 581, 589 (1985); *Flamer v. State*, Del.Supr., 490 A.2d 104, 112 (1983).

The significance of the trial judge's ruling on the admissibility of the defendant's statements to Detective Griffith is obvious. Except for these statements, the State's evidence against Wainwright was essentially circumstantial, since Dodson, called as a witness by the defense, refused to testify on grounds of self-incrimination. It is equally clear that the question of the admissibility of Wainwright's statements was one of constitutional dimension. The U.S. Supreme Court's recent decisions in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) make it clear that once an accused has exercised his right to remain silent under *Miranda*, the determination of whether subsequent statements are admissible is based on a two-part test. For such statements to be admissible, the prosecution must establish that the accused initiated further contact with the police, and validly waived his previously invoked right to counsel. The first part of the *Edwards* test—the initiation of further communication by the accused—must be considered before proceeding to decide whether there was a valid waiver. *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885; *Bradshaw*, 103 S.Ct. at 2834.

■ In this case, defense counsel's concession that the defendant's first statement was "spontaneous" probably caused the trial judge to focus only upon the "waiver" part of the *Edwards* test. Although the prosecutor, in arguing for the admissibility of the statements, properly noted that the *Bradshaw* decision discussed the importance of determining which party initiated further conversation after the accused had invoked his right to counsel, the trial judge ruled that "[t]he only thing that the State has to show is

that the defendant was warned of his constitutional rights, that he understood them, and that he waived them." Since this statement reflects an incomplete analysis of the proper test to determine whether both of the defendant's statements should have been admitted into evidence, this error is clearly prejudicial to substantial constitutional rights of the defendant and jeopardized the fairness of the trial process. Where there is plain error, the fact that the error may have been "invited" by the actions of defense counsel does not render it less significant or result in a forfeiture of appellate review. *See State v. Harper*, 128 N.J.Super. 270, 319 A.2d 771, *cert. denied*, 65 N.J. 574, 325 A.2d 708 (1974); *cert. denied*, 68 N.J. 284, 344 A.2d 318 (1975).

## III

Our review of the record requires that we examine the evidence presented by the State at the suppression hearing in the light of the State's heavy burden of demonstrating the voluntary relinquishment by a defendant of his previously asserted request for counsel. We begin with the language of *Miranda*:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.
>
> \* \* \* \* \* \*
>
> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

*Miranda*, 384 U.S. at 473–75, 86 S.Ct. at 1627–28.

In *Edwards* the Supreme Court established a bright-line rule for determining compliance with *Miranda*. This rule was further clarified in *Smith v. Illinois*, —— U.S. ——, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). In *Edwards*, the court established a "rigid prophylactic rule" that once an accused in custody expresses a desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him" unless there is a valid waiver of his request for counsel. *Edwards*, 451 U.S. at 485–86, 101 S.Ct. at 1885; *Smith*, 105 S.Ct. at 492. In *Edwards* and *Smith* the Supreme Court clearly outlined the analysis which this bright-line rule establishes.

> First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

*Smith*, 105 S.Ct. at 493. The purpose of the *Edwards* rule is to prevent police badgering or overreaching in an effort to wear down the accused despite his request for counsel. *Smith*, 105 S.Ct. at 494.

The *Edwards* standard has not proved to be easy in application and, as the divergence of opinions in *Bradshaw* attest, is open to varying interpretations. The plurality in *Bradshaw* confirmed *Edwards* as holding that once the right to counsel has been asserted by an accused, no further interrogation should take place "unless the accused himself initiates further communications." 103 S.Ct. at 2834. Justice Powell, in a concurring opinion, opined that the only new element in *Edwards* was the emphasis on the prosecution's burden of proof where "the critical question of waiver focuses on whether the initial communication by the police was proper." 103 S.Ct. at 2838 n. 2.

In his dissenting opinion in *Bradshaw*, Justice Marshall claimed that eight Justices of the Court "manifestly agree" that *Edwards* created a *per se* rule.

\* \* \* \* \* \*

The rule is simply stated: unless the accused himself initiates further communication with the police, a valid waiver of the right to counsel cannot be established. If an accused has himself initiated further communication with the police, it is still necessary to establish as a separate matter the existence of a knowing and intelligent waiver under *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The *only* dispute between the plurality and the dissent in this case concerns the meaning of 'initiation' for purposes of *Edwards'* *per se* rule.

103 S.Ct. at 2840 n. 2.

Whatever nuances may lurk in *Edwards*, as interpreted by *Bradshaw*, for present purposes the controlling principle is clear: If the police initiate further questioning after an accused requests the presence of counsel, resulting statements are excludable apart from the issue of waiver. Here it is not disputed that Wainwright actually invoked his right to counsel and thus activated the requirement that the State prove that his later incriminatory statements were the result of discussions initiated by him and were the product of a knowing and intelligent waiver of his rights under the Fifth Amendment. Wainwright's contention that Detective Griffith initiated the discussion which led to the statements, if supported by the record, would, of course, preclude application of the initiation prong of *Edwards* and foreclose the State from discharging its burden of proof on the overall issue of waiver. We turn then to the question of whether the conduct of the police in this case amounted to "initiation" within the meaning of *Edwards*.

## IV

Defendant argues that Detective Griffith's comments regarding the nature of the charge and his recitation of the substance of Dodson's statement implicating Wainwright constituted initiation of further conversation by the officer, after Wainwright had asserted his right to counsel. The State maintains that Detective Griffith's comments were mere amplification of the charges made incident to the routine booking procedure. The State points to the fact that the defendant's initial incriminating statement was not made in direct response to Detective Griffith's comments but occurred "spontaneously" approximately forty-five minutes after the defendant had been given lunch, awaiting the opening of the Magistrate's Court.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court held that "interrogation" under *Miranda* need not amount to actual questioning and may instead be the "functional equivalent" of such questioning. The Court defined the latter to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 302, 100 S.Ct. at 1690.

The State's argument that Detective Griffith's recital of what Dodson had earlier told police concerning Wainwright's participation in the liquor store robbery was a normal part of the booking processing ignores what had already occurred up to that point. Wainwright had been arrested in Maryland six days earlier on the strength of a fugitive warrant. At the time of his arrest in Maryland, Wainwright, in Detective Griffith's presence, had been advised generally of the charges against him and had been read his *Miranda* rights. Presumably at the time of his court appearance to waive extradition, the defendant was again advised of the charges awaiting him in Delaware.[1]

---

1. In Maryland, under the Uniform Criminal Ex-

tradition Act, after arrest the accused must be

Upon his arrival in Delaware the defendant was hardly in ignorance of why he was being processed. Notwithstanding the defendant's generalized knowledge of the charges against him, however, it was clearly appropriate for Detective Griffith to complete the formalities of the booking process including, again, advising the defendant of the charges against him before taking him to the nearest available Justice of the Peace for his initial appearance as required by 11 *Del.C.* § 1909 and Superior Court Rule 5(a). In going beyond the formalities of the booking process to describe the State's evidence, particularly the highly incriminatory accusations of Dodson, Detective Griffith engaged in a gratuitous and totally unnecessary tactic which was reasonably calculated to elicit a reaction from the defendant.

The fact that Wainwright's elicited reaction came not immediately but forty-five minutes later when taken from his cell to the magistrate court does not sanitize it. The response made: "I didn't kill him, he stabbed me twice" was understood by Detective Griffith to be a denial of the killing but also a claim by Wainwright that Dodson had stabbed Wainwright. Clearly Wainwright's statement was directly responsive to Dodson's claim, as recited by Detective Griffith, that Wainwright had been the triggerman while Dodson had remained outside. Even though the statement tended to be exculpatory, in fact it was highly inculpatory because it placed Wainwright at the scene and thus corroborated Dodson's statement to that effect.

Nor does the fact that the defendant's statement was made after he was placed alone in a cell render it a purely spontaneous one. Indeed, the opportunity to mull over the effect of Dodson's accusatory statements could reasonably have had the opposite effect—to impress upon the defendant the seriousness of his predicament and the need to rebut his codefendant's accusations. Any attempt to "spark" the accused's initiative to make a statement in the absence of counsel through presentation of evidence will contaminate the waiver. *Bryant v. State,* Md.Ct.Spec.App., 49 Md.App. 272, 431 A.2d 714, 718 (1981), *cert. denied,* 291 Md. 772 (1981); *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *see also State v. Quinn,* Md.App., 64 Md.App. 668, 498 A.2d 676 (1985).

In sum, we conclude that the defendant's initial statement to Detective Griffith made outside the Magistrate's Court was an elicited response to a statement made by a policeman which was reasonably likely to produce such a response. Since the defendant's elicited statement followed his request for the assistance of counsel, its admission into evidence is barred under the evolving standards of *Edwards* and *Bradshaw.*

Having determined that defendant's initial incriminatory statement was neither spontaneous nor volunteered it is unnecessary to determine whether his further statements, made after Detective Griffith reminded the defendant that he had asked for an attorney and the defendant's subsequent indication of a desire to retract his request are admissible. If, as clearly appears, the defendant's discussion of the incident was prompted by police initiation, subsequent waiver by defendant in the same continuing dialogue is also tainted. Moreover, even if defendant's second statement be viewed separately it was made

taken before a judge of a court of record who is required to inform the accused of the demand made for his surrender and the crime with which he is charged, and that the accused has the right to demand and procure legal counsel; and if the accused states that he desires to test the legality of his arrest, the judge must fix a reasonable time within which the accused can apply for a writ of habeas corpus. Md.Ann. Code art. 41 § 16 *et seq.* (1982). The accused

may waive the issuance and service of the Governor's warrant for the arrest and all other procedure incidental to extradition proceedings by executing a writing in the presence of a judge which states that the accused consents to return to the demanding state. The judge must, however, inform the accused of his rights to the issuance and service of a warrant of extradition and of his right to obtain a writ of habeas corpus. *Id.* at § 39.

only after Detective Griffith led the defendant to believe that he would contact an attorney who could be present before the defendant resumed his statement. Detective Griffith conceded that his effort to secure an attorney for the defendant was limited to a phone call to the office of the Deputy Attorney General. When he was unable to make contact with the prosecutor, the officer made no further effort to contact defense counsel and never made any effort at direct contact with the Office of the Public Defender. Thus we need not decide whether the subsequent statement by the defendant was the result of a fresh waiver made after a good faith, but unsuccessful, effort to provide the defendant with counsel. Even if the second statement is separately evaluated, it does not gain admissibility under the existing standards of "strong proof of the validity of that waiver." *See North Carolina v. Butler*, 441 U.S. 369, 374, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

## V

Because we conclude that the defendant's statements to Detective Griffith are rendered inadmissible by reason of the violations of his right to counsel under the Fifth Amendment, we decline to address his claim that his Sixth Amendment right to counsel is equally implicated. We need not, and do not, decide whether the proceedings against the defendant had reached the critical stage in the adversary process where the right to counsel was mandated in any event. *See Deputy*, 500 A.2d at 590. We note, however, that even though the defendant's statements were made immediately preceding his initial appearance before a magistrate in Delaware, he had, as part of the extradition process apparently appeared before the District Court in Maryland earlier that day. Moreover, if defendant's statements fail to gain admissibility under the standards which control his right to counsel under the Fifth Amendment, *a fortiori*, it is difficult to see how the State could meet the more exacting standards for admissibility which govern waiver of the Sixth Amendment right to counsel. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

\*   \*   \*

The conviction is REVERSED and the case is REMANDED for a new trial.